#068090

ORIGINAL

FILED
MAY 9 2008
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

STEVE PEREIRA

Plaintiff,

*vs.*

THE UNITED STATES
ex rel. U.S. POSTAL SERVICE

Defendant.

Case No. 08-342 C

## COMPLAINT

NOW COMES Plaintiff, Steve Pereira, pro se, and alleges as follows:

## PRELIMINARY STATEMENT

1. This complaint arises out of actions among current and former officials of the U.S. Postal Service and actions taken by and on behalf of those officials beginning in 2001 and continuing to the present to violate the constitutional and other legal rights of Plaintiff through acts and omissions violating Plaintiff's rights under the Protection of jurors' employment Act 28 U.S.C. §1875. Those officials sought to punish the Plaintiff in retaliation for having filed a charge with the Equal Employment Opportunity Commission (EEOC).

2. Plaintiff seeks injunctive and declaratory relief, as well as money damages as provided under 28 U.S.C. §1875.

## JURISDICTION

3. This Court has jurisdiction of this case under 28 U.S.C. § 1491(a)(1) (the Tucker Act) as a "claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. 28 U.S.C. §1491(a)(2). To provide an entire remedy and to complete the relief afforded by the judgment, the

#1

[Court of Federal Claims] may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, . . . and such orders may be issued to any appropriate official of the United States.

## PARTIES

5. Plaintiff, Steve Pereira, is a Malaysian born naturalized American citizen employed by the United States Postal Service since December 27, 1980. He is identified as an Asian of black color. At all times relevant, he was a Postal Inspector in the employ of the Southwest Division and domiciled in Tulsa, OK from June 1998 to May 2002. Alan T. Holmes, a U.S. Postal Service official terminated Plaintiff's employment in retaliation for having filed a charge with the Equal Employment Opportunity Commission (EEOC).

6. Defendant United States of America acting through the U. S. Postal Service is responsible for enforcement of federal statutes. The U. S. Postal Service's termination of Plaintiff's employment was arbitrary, capricious, contrary to law, and unsupported by substantial evidence.

## FACTS

7. On May 30, 2000, Plaintiff initiated an equal opportunity ("EEO") administrative complaint within the U.S. Postal Service, charging that Holmes and Thomas P. Brady, Assistant Inspector-in-Charge, Southwest Division, engaged in racial discrimination in violation of Title VII for failure to promote.

8. On January 23, 2001, Plaintiff and Holmes and Brady attended a mediation session in Oklahoma City, OK to resolve the EEO complaint. We were unable to reach a settlement.

9. Upon information and belief sometime in February 2001, Bruce Smith, Special Investigator, Oklahoma Tax Commission receives a packet of information from Jane G. Eyre, Information Disclosure Specialist of the Inspection Service, alleging that the Plaintiff is evading Oklahoma state income taxes. The Postal Service maintains confidential records on employees including the Plaintiff as part of a system of records. Without obtaining the Plaintiff's prior written consent or authorization, Eyre intentionally disclosed the contents of these confidential records to the Oklahoma Tax Commission.

10. On or about February 23, 2001, Mitchell D. Davis, Team Leader, Southwest Division (Plaintiff's supervisor), telephoned Plaintiff and requested that Plaintiff provide his physical address on the employee brief document. Plaintiff advised Davis that the collection of this information was voluntary and that he did not wish to provide his physical address. Davis then informed Plaintiff that he would be on vacation from March 10, 2001 through March 18, 2001 and that Plaintiff would be the acting Team Leader during his absence.

11. On or about February 27, 2001, shortly after 2 pm, Davis telephoned Plaintiff and stated that Holmes wanted his physical address so he could verify where Plaintiff

parked his official vehicle overnight. Plaintiff informed Davis that he would e-mail his address to him, which he did at 2:23 pm (CST). There is no Postal Service regulation requiring verification of where the vehicle is parked overnight. At 4:45 pm (EST) the same day, Holmes sent Plaintiff an e-mail stating that his drive-home authorization has been rescinded effective immediately.

12. On or about February 27, 2001, Holmes sent an email to Lawrence Katz, Inspector in Charge, Office of Counsel/Inspection Service, stating that as he prepared for the mediation session he had reviewed Plaintiff's employment records and noticed that Plaintiff was still using a North Texas address. Holmes also states that he had know for approximately 18 months that Plaintiff was living outside the 50 mile radius of his office. Holmes wanted to know what he could do about this. Holmes states that ... "on Form 2693, the form itself indicates that the collection is authorized by Public Law 39 USC 401, etc. and its completion is voluntary." Holmes adds that Plaintiff is also committing tax fraud.

13. On or about February 27, 2001, Katz responds to Holmes email stating that the matters raised by Holmes should be dealt with as an administrative matter and should not progress to the disciplinary stage. Katz goes on to add that "...we'll work with you if it does."

14. On or about February 28, 2001, Plaintiff is carbon copied an e-mail from Davis to Holmes informing Holmes that Plaintiff had in fact provided the address as requested. In the e-mail Davis requests that Plaintiff's drive home authorization be re-instated. Holmes never responded to this request.

15. On or about February 28, 2001, Holmes sent Katz an email advising that he did receive Plaintiff's physical address. Holmes added that he was not inclined to reinstate Plaintiff's drive home privilege.

16. On or about February 28, 2001, Katz sent Holmes an email. In the email Katz makes suggestions on the wording of a letter to the Plaintiff. Katz wrote "Instead of reference to master file – I would put payroll records...."

17. On or about March 2, 2001, Davis called to inform Plaintiff that Holmes had ordered him to rescind Plaintiff's detail as acting Team Leader. Davis stated that since Plaintiff was no longer authorized home-to-work use of an official vehicle Plaintiff could not be the acting Team Leader during his absence.

18. On or about March 5, 2001, Holmes sent an email to a Conrad J. Aleksinski requesting that he obtain Plaintiff's drivers license and personal auto information in the states of Oklahoma, Arkansas and Texas.

19. On or about March 5, 2001, Conrad J. Aleksinski sent an email to Holmes advising him that he had obtained Plaintiff's information from Texas. Aleksinski added that he had faxed a request to the Post Office for the information on boxholder for P.O. Box 3045, Tulsa, OK and he would advise as soon as he got the information.

20. Upon information and belief, on March 7, 2001, M. Kathy Czupor, Inspector in the Office of Inspections, received via fax a copy of Plaintiff's utility service application from the Wagoner Public Works Authority.

21. On or about March 9, 2001 Czupor makes a request, via PS Form 558, to the Postmaster of the Wagoner Post Office requesting that he verify Plaintiff's address in Wagoner, OK.

22. On or about March 10, 2001, Plaintiff received a letter dated March 1, 2001 from Holmes requesting that he complete the enclosed P.S. Form 1216, Employee's Current Mailing Address and P.S. Form 2693, Personnel Questionnaire. In his letter, Holmes states that the Inspection Service's database showed Plaintiff's mailing address to be P.O. Box 3045, Tulsa, OK 74101-3045, which is also the office address. Holmes stated that it was improper for Plaintiff to use the office address to receive mail.

23. On or about March 16, 2001, Czupor receives via fax a copy of Plaintiff's Texas drivers' license record from the Texas Motor Vehicle Department. There is no information on the reason for the procurement of this record. Title 18, United States Code 2721 governs the use of personal information from State motor vehicle records.

24. On or about March 22, 2001, Davis came to Plaintiff's office to conduct a review. As part of the review Davis asks Plaintiff for his drivers' license to verify the continuing validity of the license. When Plaintiff produced his drivers' license, Davis questioned him about why he had a Texas drivers' license, Plaintiff explained to Davis that his legal domicile by choice was Texas and therefore it was proper that his drivers' license is from Texas. Davis wrote down Complainant's drivers' license number on a note pad and continued with the review.

25. On or about March 26, 2001, Plaintiff received a letter from Davis dated March 23, 2001 regarding the review he conducted on March 22, 2001. In the letter Davis informs Plaintiff that Plaintiff is a resident of Oklahoma and for him to obtain an Oklahoma drivers' license.

26. On March 27, 2001 a travel voucher submitted by Plaintiff on March 21, 2001 seeking reimbursement of $840.80 in official travel related expenses was returned by Davis. In a memo attached to the travel voucher Davis wrote that he was not approving the travel voucher because Plaintiff had used his personally owned vehicle without prior approval.

27. Plaintiff resubmits the travel voucher providing the specific citations authorizing use of personally owned vehicle and allowing for reimbursement of mileage. Section 156.14 of the Inspection Service Manual explicitly provides that "Employees who voluntarily use their personal vehicles while performing official business will be reimbursed for mileage but need to be aware of their personal liability."

28. On or about April 11, 2001 Plaintiff completed the Form 1216 based on Holmes letter of dated March 1, 2001 wherein he stated that Plaintiff was no longer to use the Tulsa office address to receive mail.

29. On or about April 17, 2001, Plaintiff is ordered by Davis to meet with him at the McDonald's restaurant located on the turnpike at Stroud, OK. When Plaintiff arrived at the restaurant he was asked to sign for a letter of warning. The letter of warning was for (1) Failure to follow a direct order – the completion of P.S. Forms 1216 and 2693 as directed by Holmes in his letter dated March 1, 2001. (2) Failing to furnish his address. Plaintiff did in fact provide a new mailing address when he completed PS form 1216 on April 11, 2001 and provided his physical address via email on February 27, 2001.

30. On April 18, 2001, Plaintiff was placed on administrative leave (non-duty status with pay). He was told not to go into any Inspection Service Office. He was further ordered to report by telephone to either his supervisor or his secretary between the hours of 9am and 10am each workday.

31. On or about April 18, 2001, Plaintiff files a grievance in response to the letter of warning issued by Davis,

32. By a letter from Holmes dated May 7, 2001, Plaintiff is ordered to undergo a mandatory psychiatric examination at the Isaac Ray Center, Inc. in Chicago, IL on May 30 and 31, 2001.

33. On or about May 9, 2001, Holmes sent a letter to Ms. Janice Blaney at the Isaac Ray Center providing background information about Plaintiff. Holmes wrote "As Inspector in Charge of the Southwest Division, I find the request for a home address, mailing address and home telephone number for an inspector assigned to this division a realistic request." Holmes continued, "Inspector Pereira complains that production of this information by him is a violation of his right to privacy and that he does not want this information divulged to the public."

34. Upon information and believe on or about May 16, 2001, Czupor advises Holmes that Plaintiff had not filed Oklahoma tax returns for 1998 or 1999. Plaintiff is alleged to owe $9,216 in back taxes for 1998 and 1999. Holmes is also informed that Plaintiff used the Tyler, TX address for federal income tax purposes.

35. By letter dated May 21, 2001, Plaintiff is advised by Davis that he is upholding the letter of warning.

36. In the evening hours of on or about June 26, 2001 Czupor and a fellow inspector went to the residence of Complainant's ex-wife in Fort Smith, AR wanting to interview her. Even after she advised them she did not want to talk to them, Czupor persisted even leaving her business card and asking Ms. Pereira to call her.

37. On or about June 26, 2001 Czupor obtains copies of Plaintiff's real estate records in Sebastian County, AR.

38. On or about June 26, 2001, Czupor obtains copies of Plaintiff's divorce decree and custody support and property settlement agreement.

39. On June 27, 2001, Czupor conducted a search of Plaintiff's locked desk and file cabinets in his office and removed material from these places. Plaintiff was never given a copy of a search warrant or an inventory of the materials taken.

40. On June 28, 2001 Czupor travelled to Tyler, TX to interview Ms. Beverly Moore at the Tyler Post Office. Ms. Moore was advised that Plaintiff was under an internal investigation. Ms. Moore was asked questions about why Plaintiff was using her residential address to receive mail and asked if Plaintiff ever lived with her. Ms. Moore was also asked to provide a sworn statement.

41. Upon information and believe on or about June 28, 2001, Czupor obtains a copy of a jury questionnaire completed by Plaintiff from Pat Ammons. Title 18 USC Section 245, Interference with Federally Protected Activities, defines serving as juror in state court as a federally protected activity to be free from any interference.

42. Upon information and believe on or about June 28, 2001, Czupor obtains Plaintiff's Texas Voters' Registration information.

43. Upon information and belief, on or about June 29 2001, Czupor meets with Smith about Plaintiff's state income tax matters.

44. On or about June 30, 2001, Czupor sends an email to Holmes and Katz informing them that, based on her discussions with Smith, Plaintiff would be indicted for tax evasion by the end of the week.

45. On or about July 11, 2001, Czupor discusses Plaintiff's jury questionnaire with Jim Huggler, Assistant District Attorney, Smith County.

46. Upon information and belief on or about July 11, 2001, Czupor sent Holmes and Katz an email informing them that Jim Huggler and Pat Ammons declined prosecution of the Plaintiff.

47. By a letter from Mr. Holmes dated August 3, 2001; Plaintiff is advised that the fitness for duty examination at the Isaac Ray Center had determined that he was fit for duty. Holmes went on to say that due to an Office of Inspections investigation Plaintiff would continue on paid administrative leave. New instructions were issued requiring Plaintiff to call Ms. Kay Hunt at (817) 317-3497 at 10am Monday through Friday.

48. In a letter dated August 14, 2001 from the Oklahoma Tax Commission, signed by Smith, Plaintiff is informed that he is under criminal investigation by the Special Tax Enforcement Unit of the Oklahoma Tax Commission. The letter goes on to state that "Information made available to our offices indicates you had a filing requirement yet failed to file the required income tax returns for the years 1998 and 1999." Upon information and belief, Plaintiff learns that a copy of this letter is also provided to Czupor.

49. On or about August 20, 2001, Smith informs Czupor that Plaintiff has signed the certified receipt for his letter. Smith advises Czupor that after the interview with Plaintiff he would prepare a district attorney letter.

50. On or about September 5, 2001, Holmes sends an email to Czupor informing her of a conversation Plaintiff had with another postal inspector. Holmes also makes reference to Plaintiff's address on his federal tax returns.

51. On or about September 13, 2001 Plaintiff met with Smith from the Oklahoma Tax Commission. Plaintiff showed Smith his W-4 for the years 1998 through 2000 showing that he had no requirement to file an Oklahoma tax return.

Plaintiff pointed out that in Commission order 99-05-10-015, the Commission stated:

a) Domicile presumed to continue unless taxpayer can show a change;

b) The state for which withholdings are referred on the Form W-2 shall be deemed evidence of state of residence.

Plaintiff asserted to Smith that he was a citizen of Texas and at no time did he change his domicile to Oklahoma. Also that he had no income from the state of Oklahoma. Plaintiff's W-4 showed Texas as his source of income. Plaintiff then requested to see the information that was provided to Smith. Smith refused to provide this information citing confidentiality. Plaintiff has not heard from the Oklahoma Tax Commission since this initial meeting.

52. On or about November 8, 2001, Holmes sent Czupor and Tammie Y. Moore, Inspector Attorney within the U.S. Postal Service, an email inquiring about the status of the case against Plaintiff. Holmes wrote "I am concerned that he has been out almost seven months and we are waiting for an outside agency to do something and they may not have the same sense of urgency as we do."

53. On or about November 26, Moore sends Holmes an email stating that she had spoken with Smith. According to Moore, Smith advised her that he has given himself a self imposed deadline to have his prosecutive report/referral completed by mid December. Moore continued that Smith would send her a copy of the working draft once completed. Moore stated that Smith would then send the report to his boss who is a CPA/Attorney for approval who then forwards to "The Committee." The committee is said to comprise of Doug Allen, General Counsel for the OK State Tax Commission, a state administrator, and the Deputy Director of Audit. According to Smith once he turned over the report the process can take anywhere from one day to a couple of weeks.

54. On or about November 27, 2001, Holmes sent an email to Moore and carbon copied Katz in which he wrote that IAD informed him that the US Attorney's office had declined prosecution on the matters that were presented to them. Holmes wrote "I am concerned that even if this case moves forward in OK it will not be until next year, then the trial delays, etc and assuming he is found guilty it will take the organization at least another year, before all the appeals and time delays kick in and are resolved before he is removed from the rolls. If he is found not guilty it will be next year before he is back because we will have to move him because how can he work in a state in which his credibility has been lost. Therefore, it will again be next year before anything is resolved. I understand that next month is next year, but I am

talking about the end of 2002 and possibly 2003. Meanwhile the office is not fully covered." He asks "Is there anything we can do NOW..."

55. Upon information and believe on or about January 8, 2002, Holmes receives the investigative report on the Plaintiff prepared by Czupor. In the report Czupor wrote "The basis of this investigation was the request of Alan T. Holmes, Inspector in Charge (INC) Southwest Division to investigate the conduct of Postal Inspector Ignatius Stephen (Steve) Pereira. As a result of Inspector Pereira's refusal to provide a current residence address, questions concerning Pereira's integrity and truthfulness had arisen.

56. On or about February 8, 2002 Holmes sends Kenneth F. Innes, an inspector attorney, an email asking him for an update as the status of the removal action on Plaintiff. The subject line of the email stated "RE: H Case/Removal Action."

57. On or about February 8, 2002 Innes replied to Holmes' email stating "I have revised the draft removal letter that I received from Tom Brady. It has been reviewed by Kathy Paramore and now is being reviewed by AIC Bob Demuro of the Office of Counsel. Once he lets me know that it is ready to go I will email it to Tom Brady for his review and issuance."

58. On February 27, 2002, when Plaintiff made his daily telephone call to Ms. Hunt at 10am, his call was transferred Brady. Brady informed Plaintiff that he is in receipt of the investigative report from the Office of Inspections and would like to meet with him at 1pm on February 28, 2002 at the Tulsa office to get Plaintiff's side of the story.

59. On February 28, 2002, Plaintiff met with Brady at the Tulsa office at the appointed time. Present at the meeting was Davis. Brady explained that he wanted Davis there as a witness and to take notes. Plaintiff informed Brady that he would like to read the investigative report from the Office of Inspections prior to any discussions. After reading the report Plaintiff quickly realized that Brady had no intention to hear him. Brady took a defensive posture and when Plaintiff wanted to know who authorized the release of information to the Oklahoma Tax Commission. Brady replied that he was not going to discuss the tax issue because criminal charges were pending. During a heated exchange when Plaintiff informed Brady that his divorce documents were none of their business Brady abruptly ended the meeting and escorted Plaintiff out of the office.

60. On March 1, 2002, when Plaintiff made his daily telephone call to Ms. Hunt at 10am, his call was once again transferred to Brady. Brady stated that he was not satisfied with Plaintiff's responses to the investigative report and was going to propose adverse action.

61. On March 9, 2002 Plaintiff received in the mail a Notice of Proposed Adverse Action – Removal, from Brady. The letter, dated March 1, 2002 was addressed to Plaintiff at P.O. Box 3045, Tulsa, OK and was mailed from Tulsa, OK. Section 651.63 of the Employee Labor Manual (ELM) provides that "Unless the circumstances of a particular case make it impractical, the employee's immediate

supervisor issues a written notice of proposed adverse action." Brady was not Plaintiff's immediate supervisor.

62. On or about March 9, 2002, Plaintiff mailed a response to the proposed removal to Holmes. Plaintiff requested that Holmes recuse himself from making a decision and forward the appeal to the next higher level official for review.

63. On March 14, 2002, Holmes sent Plaintiff's attorney, Larry Berger, a letter providing a list of possible dates for an oral response.

64. On or about March 28, 2002, Holmes sent inspector attorney Kenneth Innes a draft copy of his decision letter for review.

65. On or about March 28, 2002, Kenneth Innes sent a response to Holmes' email stating that it looks fine to him.

66. On or about April 5, 2002, Plaintiff along with his attorney, Larry Berger, provides an oral response to the Notice of Proposed Adverse Action. During the teleconference Holmes stated that he did not know that Plaintiff had been living in Fort Smith, AR.

67. Upon information and belief on or about April 10, 2002, Holmes obtains copies of Plaintiff's voter registration records from Smith County, Texas.

68. On or about April 12, 2002, Czupor sent Holmes an email providing him information regarding Plaintiff's vehicle registration information and voting registration through DMV.

69. On or about May 2, 2002 Holmes sends a letter informing Plaintiff that he would be removed from his employment with the Postal Service effective May 10, 2002. In Specification 1, Plaintiff is accused of providing false information in the completion of a **Texas Jury Questionnaire**.

70. On or about May 22, 2002, Plaintiff sends a letter appealing the removal action to the Deputy Chief, Professional Standards and Resource Development.

71. On or about May 31, 2002, Plaintiff sends another letter appealing the removal action to the Deputy Chief, Professional Standards and Resource Development.

72. On or about June 13, 2002, Elizabeth A. Hill, inspector attorney, sent Kenneth Innes and Elvin J. Crespo, Office of Inspections, an email advising them that she has been assigned to draft a Step 1 Decision Letter with reference to the Plaintiff. Hill requests that they provide her with any files that they may have. She informs Crespo that the case number is 983-1333933-H (1).

73. On or about July 28, 2002 Holmes receives an email from Hill inquiring if several named inspectors were investigated for alleged misconduct. Hill stated that she had discussed with Katz how the Plaintiff may attempt to make this an issue.

74. On or about July 29, 2002, Holmes responds to the email stating "First I took the majority of Inspector Pereira's comments with a grain of salt. In other words I gave them no weigh. Inspector Pereira has no credibility as far as I am concerned. He is a liar, actually committed perjury, and a sneak." Holmes closes his email by stating "It was not my intent and is still not my intent to go on a witch hunt."

75. By letter dated September 6, 2002 and signed by Ida L. Gillis, Acting Deputy Chief Inspector, Professional Standards and Resource Development, Plaintiff is informed that the removal is being upheld. Gillis wrote "You were also charged with violating the Inspection Service Code of Ethics in that you knowingly provided false information in connection with the completion of a **jury questionnaire** for the State of Texas. I find sufficient grounds for sustaining this charge." In the letter, Gillis also wrote that the conduct did not occur during the course of Plaintiff's employment.

76. On or about September 25, 2002 Plaintiff appeals the Step 1 Decision Letter to Anthony Vegliante, Vice President Labor Relations.

77. On or about October 25, 2002, Hill sent Billie D. Horton an email responding to some questions about plaintiff. Hill wrote "Regarding the completion of PS Form 1216, Mr. Pereira not only failed to update and/or accurately complete the form but made every effort to conceal his residence." Hill continued "The residency issue arose again as late as when the USPIS was mailing Mr. Pereira the Step 1 Decision Letter. There where so many addresses in the file INC Holmes had to instruct to which address I should mail the decision."

78. By letter dated November 6, 2002 signed by Anthony Vegliante Plaintiff is informed that the Step 1 decision is being upheld. Plaintiff is informed that he has no further right of administrative appeal.

79. On or about April 28, 2003, Holmes testified at Plaintiff's EEOC Hearing that he requested the Office of Inspections investigation after plaintiff was placed on administrative on April 18, 2001.

80. On or about April 29, 2003, Brady testified at Plaintiff's EEOC Hearing that he prepared the proposed letter of removal after he met with Plaintiff on February 28, 2002.

81. On or about April 29, 2003, Davis testified at Plaintiff's EEOC Hearing that there was only one letter of warning that was issued to inspector Rey Santiago and that he issued it. Davies testified that he met with Santiago and together decided what to put in the letter of warning.

82. On or about April 29, 2003, Smith testified at Plaintiff's EEOC Hearing that Plaintiff was guilty of tax evasion. However, when questioned, Smith was unable to point to a citation in the Oklahoma tax code that states a person has a requirement to file if they work in the state of Oklahoma.

83. On or about December 1, 2004, Czupor in a sworn deposition stated that prior to commencing the investigation she had no information on the plaintiff. She went on to state that she did not have any address on record for the Plaintiff. Czupor further

stated that it was her that initiated contact with the Oklahoma Tax Commission. Czupor stated that she had the Oklahoma tax authorities search the records by name and social security number to determine if any taxes had been paid.

84. On or about December 20, 2004, in a sworn deposition Holmes stated that prior to the internal affairs report he did not know if plaintiff was paying or not paying state taxes.

85. On or about July 8, 2005, Plaintiff learns of some emails between the defendants. The emails appear to show a conspiracy to violate Plaintiff's civil rights.

86. On or about July 11, 2005, the agency files a motion to suppress testimony of Lynette Johnson regarding a Giglio violation. Agency admitted that there were in fact two letters of warning prepared for inspector Rey Santiago. Agency stated that two different inspector attorneys were contacted about preparing a letter of warning for inspector Santiago which resulted in two letters of warning.

87. On or about July 12, 2005, Holmes testified that he had Brady issue the notice of proposed adverse action in order to give Plaintiff an additional level of appeal. Plaintiff's administrative appeals were in line with the appeal procedures outlined in Section 650 of the ELM.

88. On or about July 13, 2005, Davis testified that Plaintiff was in violation of Administrative Support Manual (ASM) Section 276.641 by receiving personal mail at the office. Plaintiff had never used the office address to receive personal mail.

89. On or about July 13, 2005, Smith testified that he reviewed publicly available records to determine if Plaintiff had paid any Oklahoma state taxes. Smith testified that he used Plaintiff's name and Wagoner, OK address to search the records and determined that Plaintiff had not paid taxes in 1998, 1999 and 2000. Plaintiff did not live in Wagoner, OK in 1998 and 1999.

## FIRST CAUSE OF ACTION

### Violation of 28 U.S.C. § 1875, Protection of jurors' employment

90. The Plaintiff restates as if fully set forth here each and every claim, assertion and allegation set forth in the foregoing paragraphs 1 through 96 of this Complaint.

91. The actions described herein is in violation of 28 U.S.C. § 1875 which provides that no employer shall discharge any permanent employee by reason of such employee's jury service, or the attendance or scheduled attendance in connection with such service, in any court of the United States.

92. As a direct and proximate result of the complained acts and omissions of the U.S. Postal officials, Plaintiff has suffered damages in the form of loss of wages and benefits, and substantial out-of-pocket costs, including attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests that the Court grant him the following:

A. That the Court order the United States Of America to immediately restore to Plaintiff his lost employment, salary and benefits;

B. Any attorney's fees and costs; and

C. All other appropriate relief as may be just and proper.

Dated: May 5, 2008

Respectfully submitted,

By: [signature]

Steve Pereira, Pro Se

P.O. Box 3844

Fort Smith, AR 72913

(479) 648-8859